1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

9
10
11
12
13
14

United States of America,

      Plaintiff,

vs.

Julio de Armas Diaz, Alexis Torres Simon, and Alexander Del Valle-Garcia,

      Defendants.

Case No.: 2:13-cr-00148-JAD-GWF

**Omnibus Order re: Motions in Limine**
**[## 134, 142, 143, 147 & 161]**

15
16
17
18
19
20
21
22

      Defendants Julio De Armas Diaz and Alex Torres Simon are accused[1] of running an organized retail theft crew that carried out a series of large-scale thefts of luxury purses, high-end jeans, shoes, and other items between October 2012 and April 2013.  During this alleged crime spree, Diaz and Simon also stole medical supplies from two pharmaceutical vans whose drivers had left the doors unlocked.  Simon formulated a plan to rob another pharmaceutical delivery van from the same company and kidnap its driver, and he recruited a confidential human source ("CHS"), along with Diaz and Alexander Del Valle Garcia to join him in the heist planned for the early morning of April 8, 2013.

23
24
25

      That morning, Diaz and Simon drove together to a school parking lot near the intended victim's home.  Garcia and the CHS arrived together in a separate vehicle at the planned meeting place.  Before they could proceed to the target van, federal agents

26

---

[1] This section is included for background purposes only and is not intended as any finding of fact.

1   descended upon them, arrested them, and found a gun in Simon's car and a roll of duct tape
2   and three pairs of gloves in Garcia's.  Diaz, Simon, and Garcia were indicted for various
3   conspiracy and theft-related offenses, and their joint trial is scheduled to begin on April 28,
4   2014.

5        In anticipation of trial, the parties filed numerous motions, including:

6   •   Defendant Simon's Motion in Limine to Limit Testimony of Improper "Overview"
7       Witness Special Agent Shay Christensen [Doc. 147];

8   •   The United States' First Motion in Limine to Preclude Questioning Regarding
9       Specifics of Recording Device [Doc. 134];

10  •   Defendant Diaz's Motion in Limine to Preclude the Admission of Co-Defendant
11      Simon's Statements Against Diaz [Doc. 142]; and

12  •    Defendant Garcia's Motion in Limine to Exclude Co-Conspirator Statements [Doc.
13      143], and Motion for Leave to File Reply to Doc. 143 [Doc. 161].

14  **Discussion**

15      Although the Federal Rules of Evidence do not explicitly authorize motions in limine,
16  the trial courts' general authority to manage trials permits trial judges to rule on evidentiary
17  issues before the start of trial.[2]  Pretrial consideration of evidentiary issues serves to avoid the
18  futile attempt of "unring[ing] the bell" when jurors have seen or heard inadmissible evidence,
19  even when stricken from the record.[3]  Motions in limine may also save expensive trial time
20  because ruling on evidentiary disputes in advance minimizes side-bar conferences and other
21  disruptions at trial, and potentially obviates the need to call certain witnesses.[4]

22

23  —————————

[2] *See Luce v. United States*, 469 U.S. 38, 40 n. 2 (1984).

[3] *Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003) (quotations and citations omitted).

[4]  *See United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002).

2

1    These policy considerations must be weighed against the loss of the court's ability to

2    consider evidence in the context of the trial when the court is "better situated . . . to assess the

3    value and utility of evidence."[5]  Limine rulings are provisional; they are "not binding on the

4    trial judge [who] may always change [her] mind during the course of a trial."[6]  "Denial of a

5    motion in limine does not necessarily mean that all evidence contemplated by the motion will

6    be admitted to trial.  Denial merely means that without the context of trial, the court is unable

7    to determine whether the evidence in question should be excluded."[7]  With these principles in

8    mind, the Court addresses these motions in limine in turn.

9

A.    **Defendant Simon's Motion in Limine to Limit Testimony of Improper**

10    **"Overview" Witness Special Agent Shay Christensen [Doc. 147]**

11    Simon asks the Court to preclude Special Agent Christensen—who was tasked with

12    investigating the conduct of the "retail theft crew" that culminated in its April 8, 2013,

13    attempted robbery of the delivery van—from providing "improper 'overview'" testimony at

14    trial.  Doc. 147.  Christensen interviewed many witnesses and relied heavily on information

15    provided to him by the CHS in the course of his investigation of this case.  *See id.* at 2-3.

16    Simon notes that Christensen provided "overview" testimony of the government's entire case

17    to the grand jury, and he seeks to prevent Christensen from offering essentially a second

18    opening statement for the government or testifying about the meaning of any Spanish-

19    language conversations that he heard in the course of his investigation.  *Id.* at 3.  Simon

20

21    ───────────────

22    [5] *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007); *accord Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975) ("A better practice is to deal with questions of admissibility of evidence as they arise.").

23

24    [6] *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000); *accord Luce,* 469 U.S. at 41 (noting that in limine rulings are always subject to change, especially if the evidence unfolds in an unanticipated manner).

25    [7] *Tracey v. Am. Family Mut. Ins. Co.*, 2010 WL 3724896, at *2 (D. Nev. Sept. 17, 2010) (quoting *Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004)).

26

1   contends that Christensen's testimony "should be limited to the facts in evidence at the time

2   he testifies," and the Court should also "limit his ability to bolster or appear to corroborate

3   the Government's case." *Id*. at 4-5.

4       Federal Rule of Evidence 701 provides:

5   
6           If a witness is not testifying as an expert, testimony in the form of
           an opinion is limited to one that is: (a) rationally based on the
           witness's perception; (b) helpful to clearly understanding the
           witness's testimony or to determining a fact in issue; and (c) not
7           based on scientific, technical, or other specialized knowledge
           within the scope of Rule 702.[8]

8   
9   There is no indication that Christensen, if called, intends to testify as an expert.  And the

10   government concedes in its response, "The United States agrees that hearsay evidence is not

11   admissible through overview or summary witnesses."  Doc. 148 at 1.  However, the

12   government does oppose a general prohibition against overview or summary testimony,

13   which is permissible in many forms and for various purposes.  *Id*. at 2, n. 2–3 (collecting

14   cases).  The government concludes, "the United States does not intend to introduce

15   inadmissible hearsay through its Agent Christensen, but reserves the right to elicit relevant

16   testimony as permitted by the Rules of Evidence." *Id*. at 3.

17       Although the Court appreciates that some overview evidence may be admissible and

18   some inadmissible, the government appears to acknowledge these boundaries and represents

19   its intention to steer clear of them at trial.  Simon's exclusion request lacks the specificity

20   necessary for this Court to make a reasoned and informed analysis of any particular,

21   anticipated testimony such that the Court can determine whether it should be admitted or

22   excluded.  Accordingly, this motion is denied without prejudice to Simon's ability to timely

23   object to any specific attempts by the government to elicit such "overview" testimony at trial

24   when the Court can fairly consider this argument in the context of specific questioning.

25   
      [8] Fed. R. Evid. 701.

26

**B.     The Government's First Motion in Limine to Preclude Questioning Regarding Specifics of Recording Device [Doc. 134]**

The CHS used a recording device to capture a conversation between himself, Diaz, and Simon during a car ride on April 7, 2013.  Doc. 134 at 1.  The government asks the Court to limit the defense's inquiry into the specifics of this recording device, arguing a law-enforcement-privilege protection: if this recording method becomes public knowledge, future suspects will be able to "search for, detect, and defeat law enforcement surveillance equipment," and while such inquiries typically require the court to balance protection of law enforcement surveillance techniques against the defendant's need for the evidence in presenting a defense, the CHS's recording method has no relevance to this defense.  *Id.* at 1-3.

In *Rovario v. United States*, the Supreme Court recognized a limited privilege not to disclose the identity of a confidential government informant.[9]  Persuasive authority from other circuits has extended *Rovario* to recognize "a qualified government privilege not to disclose sensitive investigative techniques," provided the exclusion of such techniques does not unduly prejudice the defense.[10]  This Court need not predict whether the Ninth Circuit would similarly extend *Rovario* because no defendant has opposed the government's motion.  Local Rule 47-9 provides, "The failure of an opposing party to file points and authorities in response to any motion shall constitute a consent to the granting of the motion."[11]  By express order, the Court directed that any opposition be filed by Wednesday, April 16, 2014.  None of the three defendants filed a response to this motion.  The Court construes this silence as

---

[9] *Rovario v. United States*, 353 U.S. 53, 59-60 (1957).

[10] *United States v. Van Horn*, 789 F.2d 1492, 1507 (11th Cir. 1986); *see United States v. Harley*, 682 F.2d 1018, 1020-21 (D.C. Cir. 1982).

[11] L.R. 47-9.

5

defendants' consent to the preclusion of the recording-technique inquiry and, thus, grants the government's motion in this regard.

### C.   Diaz's Motion in Limine to Preclude Simon's Statements from Being Admitted Against Diaz [Doc. 142]

Diaz argues that there are two categories of hearsay evidence that implicate him: (1) statements made by Simon to the CHS that implicate Diaz in the events of October 15, 2012, November 14, 2012, and March 31, 2013; and (2) an April 7, 2013, recorded conversation between Simon, the CHS, and Diaz regarding past conduct.  Doc. 142.  Diaz contends that statements in the first category violate his Sixth Amendment confrontation rights under *United States v. Bruton*[12] because Simon will not be subject to cross examination at trial, and he asserts that the April 7th conversation is inadmissible hearsay not salvaged by any exception.  *Id*.  The government opposes the motion by reiterating its prior representation to the court and Diaz that it "will not seek to introduce statements within the first category that violate *Bruton*," Doc. 158 at 2, but also confirming that it does intend to offer the April 7th car-ride conversation, which is admissible as either a coconspirator's statement under FRE 801(d)(2)(E) or an adoptive admission under FRE 801(d)(2)(B).

#### 1.   No anticipated *Bruton* violation

The government's repeated representations that it does not intend to introduce the statements that Diaz contends would violate his Confrontation Clause rights under *Bruton* demonstrates that there is no evidentiary dispute in this regard for the Court to resolve.  Accordingly, the motion is denied in this regard without prejudice to Diaz's right to raise this objection at trial in the event that the government attempts to introduce a facially incriminating confession of one of Diaz's non-testifying co-defendants at this joint trial.

---

[12] 391 U.S. 123 (1968).

6

1

2

    **2.**    **Simon's April 7, 2013, statements to the CHS during the car-ride conversation are admissible against Diaz.**

3        Diaz contends that Simon's statements during the April 7th car-ride conversation

4 about past events are inadmissible hearsay not subject to any exception. Doc. 142 at 3. He

5 characterizes Simon's statements as "narrations of past events" that "do not further the

6 conspiracy in any way" and, therefore, are not saved from hearsay exclusion as coconspirator

7 statements. *Id*. He further contends that these statements are not adoptive admissions

8 because it cannot be conclusively determined based on the transcripts of the translated, car-

9 ride conversation that "Diaz had the opportunity to hear and understand these statements"

10 over the traffic noise. *Id*. at 4.

11        ***a.***    ***Coconspirator Statements Under Rule 801(d)(2)(E)***

12        The government argues that Simon's statements during the April 7th car-ride

13 conversation about past events are admissible as coconspirator statements. FRE 801(d)(2)(E)

14 recognizes that a statement made "by the party's coconspirator during and in furtherance of

15 the conspiracy"[13] qualifies as an exception to the hearsay rule of exclusion *and* presents no

16 Confrontation Clause issue. A statement "furthers" a conspiracy when it advances the

17 conspiracy's common objectives or sets in motion events integral to the conspiracy.[14]

18 "Narrations of past events are inadmissible, but expressions of future intent or statements that

19 further the common objectives of the conspiracy or set in motion transactions that are an

20 integral part of the under Rule 801(d)(2)(E)."[15]  For example, narrative statements designed

21 to prompt additional action among the conspirators, "reassure" coconspirators of the

22

23

    [13] Fed. R. Evid. 801(d)(2)(E); *see Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987).

24

    [14] *United States v. Yarbrough*, 852 F.2d 1522, 1535 (9th Cir. 1988).

25

    [15] *United States v. Bowman*, 215 F.3d 951, 961 (9th Cir. 2000) (quoting *Yarbrough*, 852 F.2d at 1535).

26

conspiracy's existence, allay a coconspirator's fears, or keep coconspirators abreast of an ongoing conspiracy's activities have been recognized as acts in furtherance of a conspiracy.[16] Although Diaz broadly asks the Court to exclude all past-event statements by Simon in the April 7th car-ride conversation, the government identifies just the three excerpts from that conversation that it intends to present in this regard and argues that each falls within the coconspirator-statement exclusion. The court evaluates each of these three statements in turn.

### i.      Transcript excerpt pg. 2

The first excerpt the government intends to present discusses the alleged robbery of a pharmaceutical delivery van at Walgreens:

> Simon:    With just—with just—with just 30 containers—
> Source:   [Overlapping voices] No, but that is just as good.
> Simon:    Fuck yeah *brother*. But then the other guy is complaining saying this and that; and I'm not, not there. I can't because I've given him plenty of time.
> Diaz:     Since I opened the *van*, I put 20 boxes in here and they didn't fit in the other car—
> Simon:    Yeah.
> Diaz:     And the *van* was left open.
> Simon:    [Unintelligible] we got a guy from the same company but we didn't [Unintelligible]—

Doc. 158-1 at 4 (emphasis in original). Defendant argues that these past events were not discussed in furtherance of the April 8th conspiracy because Simon and Diaz were not attempting to solicit the CHS's participation. Doc. 142 at 3. The portions of the conversation that surround this excerpt belie that characterization. This excerpt falls directly in the middle of the planning of the April 8th theft and Simon and Diaz's expression of their need for help in this endeavor. *See* Doc. 158-1 at 3-6 (Simon explains that he needs one more participant because he wants to "grab" the driver, he describes the physical stature of the driver and how they will nab and subdue him and drive the van into a garage, and then

---

[16] *Yarbrough*, 852 F.2d at 1535-36 (citations omitted).

1   Simon and Diaz describe to the CHS what they expect to find in the van based on their

2   previous experience with the other van from the same company and why they need someone

3   else to help them in this effort).  Thus, Simon and Diaz were not merely narrating past

4   events, they were trying to ensure that the CHS would participate in the April 8th van heist.

5   Accordingly, this discussion of past events was intended to further the common objectives of

6   the April 8th conspiracy and satisfies the coconspirator-statement exception to the hearsay

7   rule.

8                   ii.      *Transcript excerpt pg. 10*

9           The government next identifies a second portion of the conversation between the three

10  men it contends also pertains to the prior Walgreens heist:

11      Simon:      No, no, no but that same guy, that same guy, we haven't done it
                    to that same guy.
12      Diaz:       No we haven't done anything to this guy.
        Source:     Ooh.
13      Simon:           We have done it to the company –
        Source:     [Overlapping voices] Oh, the company.
14      Simon:      – another guy, you know what I mean?
        Diaz:       We got a chick there kid.  This one was watching out –
15      Simon:      [Overlapping voices] We got-got a chick –
        Diaz:       [Overlapping voices] – a chick got it here –
16      Simon:      [Overlapping voices] – we got a chick and we got another white
                    boy.
17      Diaz:       When the chick-when - [he] told us she was coming when she
                    was getting into the car.  And saw this one getting out from
18                  inside.
        Source:     [Laughs]
19      Simon:      Yeah.

20  Doc. 158-1 at 12.  When the surrounding portions of this discussion are considered, it is

21  apparent that this excerpt—like the previous one—is part of Diaz and Simon's attempt to

22  bring the CHS into the conspiracy loop.  They start by explaining to the CHS what types of

23  pills they expect to find in the van, caution him, "[r]emember, always wear gloves," and then

24  explain why *this* van driver wouldn't be expecting them: they haven't hit *him* yet; just

25  another van *from his company*.  *Id*. at 11-12.  The Court finds these statements admissible

26

9

1   under the coconspirator exception because they further the common objectives of the

2   conspiracy.  By this conversation, Simon was providing key details about the identity of the

3   target (company and driver) to help prepare the CHS for the anticipated heist.  Therefore, this

4   reference to the previous activities is admissible under FRE 801(d)(2)(E).

5                  ***iii.***       ***Transcript excerpt pgs. 15-18***

6          The final excerpt references what the government contends are facts related to the

7   prior Smith's and Walgreens thefts:

| | | |
|---|---|---|
| 8 | Simon: | [Overlapping voices] [Unintelligible] we would get them for two – |
| 9 | Diaz: | [Overlapping voices] – [Unintelligible] two bucks. |
| 10 | Simon: | [Overlapping voices] We guessed it at a thousand, a thousand?  There were *blue*, blue Oxycodone.  The container was this big and we guessed it right here. |
| 11 | Source: | Blue? |
| | Diaz: | Yeah.  We got and sold it for two pesos.  From one second to the next. |
| 12 | Simon: | Fuck yeah. |
| | Diaz: | Twenty little boxes – |
| 13 | Simon: | [Overlapping voices] Went home a winner, went home a winner. |
| 14 | Diaz: | – you want to know how I was? |
| 15 | Source: | There goes your Christmas. |
| | Simon: | Totally. |
| 16 | Diaz: | I grabbed and opened.  The *van* was open – |
| | Simon: | You make big bucks *brother* doing it good and fast. |
| 17 | Diaz: | I told this one "that *van* is open".  I was [Unintelligible] took the locks off the car as soon as the guy went in.  "Is he dizzy?"  Yeah. Pun! Got going and we opened it – |
| 18 | Simon: | [Overlapping voices] We opened that car that was full of boxes, *man*.  There were a bunch of good boxes. |
| 19 | Diaz: | There was no Oxycodone. |
| 20 | Simon: | Oxycodone. That's the one that pays; the big bucks *man*.  Sometimes they sell them at the clubs for twelve, thirteen, fifteen bucks, they say. |
| 21 | Diaz: | Here it goes for twenty pesos. |
| 22 | . . . . | |
| | Diaz: | That day there was 60 milligram container and one for a hundred; and then they look to see how – |
| 23 | Simon: | [Overlapping voices] No I have that one. No-no that container is there.  But it's not-it's not-it's not – |
| 24 | Diaz: | Oxycodone? |
| 25 | Simon: | No. I have them-I have them. I still have that container there tucked away. It's not-it's not – |

26

                        10

| | | |
|---|---|---|
| Source: | It's not Oxycodone? | |
| Simon: | No. It's not Oxycodone. Because I did-I did show it to this dude at that house and none of what is there is – | |
| Source: | [Overlapping voices] Roxy is small and round – | |
| Simon: | Yeah? | |
| Source: | – small, small and round. | |
| Simon: | I have a – | |
| Source: | [Overlapping voices] And it has an R in the middle. | |
| Simon: | Yeah? | |
| Source: | Yeah. | |
| Simon: | I have a little of bit of pills left there, but none of them are good. [Unintelligible] that they are Oxycodone. | |
| Diaz: | Throw them the fuck away. | |
| Simon: | Yeah, I'm going to throw all that shit away.  There is a lot of morphine. | |
| Source: | Morphine? | |
| Diaz: | I gave your dad a container. | |
| Simon: | There's morphine – | |
| Source: | [Overlapping voices] And what is that for? | |
| Simon: | – there is a bunch of shit – | |
| Diaz: | [Overlapping voices] For pain – | |
| Simon: | For my pain. | |
| Source: | Yeah. | |

Doc. 158-1 at 15-18 (emphases in original).  Simon and Diaz's explanation of the pills likely to be found in the target van and distinguishing between expensive products like Oxycondone (which can sell for as much as $15 a pill), and Morphine (which they apparently gave to Simon's father after determining it was worthless) reasonably relates this discussion to the objectives of the prospective heist, as it is designed to educate the CHS on what pills to look for.  This discussion was intended to advance the objectives of the conspiracy when examined in the context in which it occurred and satisfies the coconspirator-statement exception.

As all of these past-event excerpts the government intends to introduce satisfy the coconspirator-statement exception to the hearsay rule under FRE 801(d)(2)(E), Diaz's motion to exclude Simon's statements implicating Diaz during the April 7th car-ride discussion is denied.

### b.    Adoptive Admissions Under Rule 801(d)(2)(B)

Diaz also contends that these statements are not admissible under the adoptive

11

admission exclusion to the hearsay rule, FRE 801(d)(2)(B).  Doc. 142 at 3.  He argues that the transcript is translated from Spanish and does not reflect the realities of the conversation—which took place in a car with traffic noise, during which Simon, Diaz, and the CHS talked over one another.  Doc. 142 at 4.  Thus, it is not clear that Diaz had the opportunity to hear, understand, and respond to the statement such that the statements qualify as adoptive admissions under Rule 801(d)(2)(B).  Doc. 142 at 3-4.  In opposition, the government claims that Diaz actively participated in each of the three conversations and, "[i]n reality, Simon's statements are more than Diaz's adoptive statements; they are simply part of Diaz's own because their statements are so intertwined that they are really one."  Doc. 158 at 7.  As the Court has already found that these excerpts are admissible against Diaz as coconspirator statements made in furtherance of the conspiracy, whether they also satisfy the adoptive-admission exception need not be determined, and the Court reserves any determination of this issue.

### 3.    Statements referencing uncharged 404(b) events

Finally, Diaz notes that the government has represented that it will not introduce any statements in the April 7, 2014, transcript regarding uncharged "thefts of trains, electronic tablets, projectors and shoes," and Diaz asks that the court order that any such mention be redacted from the transcript before it is presented to the jury.  Doc. 142 at 4. The government offers no response to this request.  The Court takes the government's silence as assent, *see* L.R. 47-9, grants the motion in this regard as unopposed, and directs the government to redact from the transcript of the April 7th car-ride conversation all references to uncharged thefts.

### D.    Garcia's Motion in Limine to Exclude Co-Conspirator Statements [Doc. 143]

Garcia moves to preclude the government from introducing against him five transcripts of conversations recorded by the CHS on October 30, 2012, March 18, 2013,

April 4, 2013, and (two) on April 7, 2013, on the grounds of insufficient evidence that Garcia was a member of the conspiracy at the time the statements were made. Doc. 143. The government responds that it will only seek to introduce the April 4th and April 7th calls against Garcia. Doc. 157 at 2. Thus, the Court considers only whether the contested April 4th and 7th transcripts can be admitted as coconspirator statements against Garcia.

**1.     Evidentiary foundation for coconspirator statements**

Before admitting evidence of a co-conspirator's statement under 801(d)(2)(E), the government must demonstrate the existence of the conspiracy and the defendant's participation in it by a preponderance of the evidence.[17] The court may consider proffered hearsay statements in reaching a decision that an individual was a member of the conspiracy, and evidence short of committing the crime may suffice to allow introduction of the hearsay evidence.[18] The government must show only "slight" evidence,[19] but it must nonetheless be "fairly incriminating."[20] "In this circuit, when the proponent of a co-conspirator's statement offers *no* additional proof of defendant's knowledge of and participation in the conspiracy, the statement must be excluded from evidence. Where, on the other hand, some additional proof is offered, the court must determine whether such proof, viewed in the light of the co-conspirator's statement itself, demonstrates by a preponderance of the evidence that defendant knew of and participated in the conspiracy."[21] This is because out-of-court statements are presumptively unreliable and a co-conspirator's out-of-court statements are

---

[17] *Bourjaily*, 483 U.S. at 175.

[18] *See, e.g.*, *United States v. Stewart*, 770 F.2d 825, 831 (9th Cir. 1985); *United States v. Silverman*, 861 F.2d 571, 577 (9th Cir. 1988); *see also United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir. 2000).

[19] *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993).

[20] *Silverman*, 861 F.2d at 571.

[21] *Silverman*, 861 F.2d at 578.

13

1    "doubly suspect."[22]  "Evidence of wholly innocuous conduct or statements by the defendant

2    will rarely be sufficiently corroborative of the co-conspirator's statement to constitute proof,

3    by a preponderance of the evidence, that the defendant knew of and participated in the

4    conspiracy."[23]  The court may rely, however, on circumstantial evidence.[24]

5
       **2.    A preponderance of the evidence demonstrates Garcia's participation in
6            the conspiracy as of the late April 7th telephone call.**

7           Garcia contends there is insufficient evidence of his participation in the conspiracy

8    before he picked up the CHS on April 8, 2013, to allow his co-defendants' statements to be

9    admitted against him as coconspirators statements under Rule 801(d)(2)(E).  He makes much

10   of the fact that during the April 7, 2013, car-ride conversation, statements were made that

11   "we still need another guy," and "why we need three," which suggest that as of April 7,

12   2013, the conspiracy included only three members (the CHS, Diaz, and Simon) and Garcia

13   had not yet joined.  Garcia claims that the only evidence that might suggest his participation

14   is the fact that he gave his "friend" Giovanni (the CHS) a ride to the scene of the conspiracy,

15   and this innocent act alone is insufficient to link him to the conspiracy.  Doc. 143 at 6-7.

16   And, although he did call Simon 20 times on April 4th and 7th, 2013, he suggests it is not

17   against the law to make a phone call.  *See id.*  At the very least, Garcia argues, the evidence

18   does not place him in the conspiracy until sometime after the April 7, 2013, car-ride

19   conversation, so the April 4, 2013, conversation and the April 7, 2013, car-ride conversation

20   predate his involvement and may not be introduced against him.  *Id.*

21          The government contends the evidence demonstrates Garcia's involvement as early as

22

23   _____

        [22] *Id.* at 578.

24
        [23] *Id.*

25
        [24] *United States v. Weiner*, 578 F.2d 757, 770 (9th Cir. 1978).

26

                                                    14

April 4th.  Doc. 157 at 3-4.  It claims that on April 4, 2013, Simon told the CHS that "my partner is driving," and referred to "Alexander," which is Garcia's first name.  Doc. 157 at 10.  Simon then told the CHS that he was going to call him back "if [his] partner can go right now."  *Id.*  Simon then called Garcia, and then immediately called the CHS back stating, "I already called my partner and he said yes, said he would be here at 7:00."  *Id.*  Simon and Garcia contacted each other a total of 14 times by phone that day.  *Id.*

The government also points to Simon's statement to the CHS on the night of April 7, 2013, that his friend who was "working right now. . . is going with us."  *Id.* at 4.  Garcia was, in fact, working at that time, and Simon sent Garcia a text message that night with the CHS's name and number.  *Id.*  Between April 7, 2013, at 7:02 p.m. and April 8, 2013, Simon and Garcia talked six times.  *Id.* at 5.  Garcia then met the source on April 8 around 6 a.m., Doc. 157 at 8, but told the FBI that the CHS was a "friend" Garcia was merely driving to the MGM Grand for an interview, and that Simon called him around 6 a.m. to say that he and Diaz were in the area and Garcia should stop by and say "hi."  *Id.* at 9.

Upon a close analysis of all of this evidence, the Court does not find support by a preponderance of the evidence that Garcia joined the conspiracy until the night of April 7, 2013, sometime after the April 7, 2013 car ride.  The Court bases this finding on statements Simon made to the CHS during a telephone conversation on April 7, 2013, with an "unknown" date (and which the parties agree took place "late" that night after the car-ride conversation).  This conversation is the first time that Simon states "my partner is driving," then stated, "my friend, he is working right now, the dude that is going with us."  Doc. 142-2 at 3.  Simon then advised the CHS he should drive to Simon's "buddy's" house because the CHS was driving a car with paper plates and "you know the[ police] can stop you for any reason."  Doc. 143-2 at 4-5.  Simon stated that the CHS and his "buddy" would then drive to meet Simon and Diaz in the school parking lot.  *See id.*  Simon then advised, "I will call him

15

and give him your number so you can figure it out." *Id.* at 5.  Independent evidence corroborates that Garcia had, in fact, agreed to participate in the conspiracy at the time Simon represented that Garcia had: Garcia was in fact working at the time; later that night, Simon texted Garcia the CHS's name and a phone number; early the following morning, Garcia picked up the CHS at a pre-arranged location and drove him to the school parking lot; and Garcia had gloves and duct tape in his car.

Garcia's characterization of his conduct as "wholly innocent" and useless to enhance the reliability of Simon's statements is unavailing.  Doc. 161 at 3.[25]  The Court may rely on circumstantial evidence to find intent to participate in the conspiracy, and "innocent" conduct must be contextualized.  For example, the Ninth Circuit has held that evidence that the defendant was the last[26] or only[27] visitor to a house where a drug deal then occurred—independently innocent conduct—was sufficient to connect the visitor to the conspiracy.  In *United States v. Zavala-Serra*, the Ninth Circuit affirmed the trial court's reliance on a combination of admissions, hearsay statements, and phone records as sufficient to show participation in a conspiracy.[28]  And in *United States v. Castaneda*, a Ninth Circuit panel found that evidence a defendant was present at a meeting between three money launderers in which they conducted several money laundering transactions sufficient proof of participation.[29]  The Court rejected the defendant's argument that the evidence could just as easily infer that he "dropped by to say hello," and "[t]here is nothing incriminating about

---

[25] Garcia quotes *Silverman*, 861 F.2d at 578.

[26] *United States v. Paris*, 827 F.2d 395, 400 (9th Cir. 1987).

[27] *United States v. Mason*, 658 F.2d 1263, 1269-70 (9th Cir. 1981).

[28] *United States v. Zavala-Serra*, 853 F.2d 1512, 1514-15 (9th Cir. 1988).

[29] *United States v. Castaneda*, 16 F.3d 1504, 1508 (9th Cir. 1994).

16

that."[30]

Garcia similarly argues that on the morning of April 8, 2013, he innocently "dropped by" the parking lot where Diaz and Simon were waiting, without knowledge of their conspiracy.  But when contextualized with (1) Simon's texting the CHS's name and phone number to Garcia;[31] (2) Garcia picking up the CHS the morning of the 8th as Simon had foretold; and (3) the presence of three pairs of gloves and duct tape in Garcia's car, Garcia's innocent explanation is incredible.  This evidence, viewed in the light of Simon's statements, demonstrates by a preponderance of the evidence that at least as of the night of April 7th, Garcia was the fourth member who would be joining in the kidnaping and robbery conspiracy.[32]  Garcia's motion in limine is granted in part: no hearsay statements of Diaz or Simon prior to the April 7, 2013, telephone call may be introduced *against Garcia* based on the coconspirator exception.  Counsel for Garcia shall provide the Court with a proposed jury instruction by the start of trial that properly advises the jury that Diaz and Simon's statements prior to that point may not be considered as evidence against Garcia.  The government shall ensure that the jury instruction is read to the jury before introducing any statements by Diaz or Simon that predate the April 7th phone call.  The government is further directed to redact from the transcript of any Diaz or Simon statement before this point the names "Alexander" and "Ale."  These redactions must be made prior to the introduction of the transcripts at trial.

**E.      Garcia's Motion for Leave to File Reply to Doc. 143 [Doc. 161]**

After briefing on Doc. 143 was closed, Garcia filed a motion for leave to file a reply

---

[30] *Id.* at 1508-09.

[31] Garcia argues that this text message is inadmissible hearsay, Doc. 143 at 7, but there is no indication that this message will be introduced to prove the truth of any matter.  Accordingly, the text message does not appear to be hearsay, and no exclusion or exception to the hearsay rule need be considered.

[32] *Silverman*, 861 F.2d at 578.

17

with the limited purpose of "correcting" an apparent omission in the government's response. Doc. 161.  Garcia's reply acknowledged the Court's minute order setting a briefing schedule on these pending motions, which explicitly stated that no replies would be authorized.  Doc. 151 (minutes).  The point of this limitation was to permit both sides of any dispute to brief their positions while allowing the Court sufficient time to decide these numerous, late-filed motions without having to postpone the trial.

The scope of Garcia's reply brief belies its his representation that it is submitted "for the limited purpose of correcting the government's omissions of a crucial aspect of the law governing admission of co-conspirator statements made before a defendant joins the conspiracy," Doc. 161 at 1, as the reply also mounts new arguments and provides far more detail than the original motion.  The Court strongly cautions the parties against the sandbagging practice of filing a thin motion as a toe in the door for a more substantive reply. While the Court has considered this reply brief and thus the Court grants Garcia's motion for leave to file it this time, **because trial is starting on Monday no other reply briefs will be considered.**

### Conclusion

For all the foregoing reasons, and with good cause appearing, IT IS HEREBY ORDERED THAT:

- Simon's Motion in Limine to Limit Testimony of Improper "Overview" Witness Special Agent Shay Christensen **[Doc. 147] is DENIED** without prejudice as premature.

- The Government's First Motion in Limine to Preclude Questioning Regarding Specifics of Recording Device **[Doc. 134] is GRANTED.**  Defendants shall not inquire into the CHS's recording methods.

- Diaz's Motion in Limine to Preclude the Admission of Co-Defendant Simon's

Statements Against Diaz **[Doc. 142] is GRANTED in part and DENIED in part**. The request to exclude Simon's statements implicating Diaz is denied; the request that any uncharged offenses mentioned in the April 7th transcript be redacted is granted.

- Garcia's Motion in Limine to Exclude Co-Conspirator Statements **[Doc. 143] is GRANTED in part and DENIED in part**. No hearsay statements of Diaz or Simon prior to the April 7, 2013, telephone call may be introduced *against Garcia* based on the coconspirator exception. Counsel for Garcia shall provide the Court with a proposed jury instruction by the start of trial that properly advises the jury that Diaz and Simon's statements prior to that point may not be considered as evidence against Garcia. The government shall ensure that the jury instruction is read to the jury before introducing any statements by Diaz or Simon that predate the April 7th phone call. The government is further directed to redact from the transcript of any Diaz or Simon statement before this date the names "Alexander" and "Ale." These redactions must be made prior to the introduction of the transcripts at trial.

- Garcia's Motion for Leave to File Reply to Doc. 143 **[Doc. 161] is GRANTED.**

DATED: April 25, 2014.

_____
Jennifer A. Dorsey
United States District Judge

19